**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY | ) | |
| 378 N. Main Avenue | ) | |
| Tucson, Arizona 85701, | ) | Civ. No. 1:16-cv-1049 |
| | ) | |
| EARTHWORKS | ) | |
| 1612 K St. NW, Suite 808 | ) | |
| Washington, DC 20006, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS L. TIDWELL | ) | |
| Chief, U.S. Forest Service | ) | |
| 1400 Independence Ave., SW | ) | |
| Washington, DC 20250, | ) | |
| | ) | |
| U.S. FOREST SERVICE | ) | |
| 1400 Independence Ave., SW | ) | |
| Washington, DC  20250, | ) | |
| | ) | |
| U.S. DEPARTMENT OF AGRICULTURE | ) | |
| 1400 Independence Ave., SW | ) | |
| Washington, DC 20250, | ) | |
| | ) | |
| SALLY JEWELL | ) | |
| Secretary, U.S. Department of the Interior | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
| U.S. FISH AND WILDLIFE SERVICE | ) | |
| 1849 C Street, NW | ) | |
| Washington, DC 20240, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

## INTRODUCTION

1.    Plaintiffs Center for Biological Diversity and Earthworks (collectively, "Plaintiffs") challenge the failure of Defendants Thomas L. Tidwell, United States Forest Service, and United States Department of Agriculture (collectively, "Forest Service"); and Defendants Sally Jewell and United States Fish and Wildlife Service (collectively, "FWS"), to comply with the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*., and provide adequate protections for the threatened northern long-eared bat (*Myotis septentrionalis*), gray wolf (*Canis lupus*), and Canada lynx (*Lynx canadensis*) on the Superior National Forest in northeastern Minnesota.

2.    Plaintiffs challenge (1) the failure of FWS and the Forest Service to reinitiate and complete ESA consultation concerning the effects of continued implementation of the revised Land and Resource Management Plan ("Forest Plan") for the Superior National Forest on the northern long-eared bat, gray wolf, and Canada lynx; (2) FWS's September 16, 2011 Biological Opinion for the Forest Plan for the Superior National Forest; (3) the Forest Service's ongoing failure to insure that implementation of the Forest Plan for the Superior National Forest is not likely to jeopardize or adversely modify or destroy critical habitat for the northern long-eared bat, gray wolf or Canada lynx; and (4) the Forest Service's continued authorization of projects and activities on the Superior National Forest that may adversely affect the northern long-eared bat, gray wolf, Canada lynx, or their critical habitat, prior to the reinitiation and completion of ESA consultation on the continued implementation of the Forest Plan.

3.    Plaintiffs seek (1) declaratory relief that FWS and the Forest Service violated the ESA in failing to reinitiate consultation on the continued implementation of the Forest Plan for the Superior National Forest; (2) declaratory relief that FWS violated the ESA in preparing the

2011 Biological Opinion for the Forest Plan for the Superior National Forest; (3) injunctive relief to compel FWS and the Forest Service to immediately reinitiate consultation on the Forest Plan for the Superior National Forest, and to compel FWS to prepare a legally adequate Biological Opinion for the Forest Plan; and (4) injunctive relief to enjoin projects and activities on the Superior National Forest that may adversely affect the northern long-eared bat, gray wolf, Canada lynx, or their critical habitat, pending the reinitiation and completion of ESA consultation and a legally adequate Biological Opinion.

## JURISDICTION

4.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331; 28 U.S.C. § 1346; 5 U.S.C. §§ 551 *et seq*., and 16 U.S.C. § 1540(g) because this action involves the United States as a defendant and arises under the laws of the United States, including the ESA, 16 U.S.C. §§ 1531 *et seq*., and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*.  Plaintiff Center for Biological Diversity provided Defendants with notice of the Center's intent to file suit pursuant to the ESA citizen suit provision.  16 U.S.C. § 1540(g)(2).  An actual justiciable controversy exists between Plaintiffs and Defendants.  The requested relief is proper under 28 U.S.C. §§ 2201 & 2202; 5 U.S.C. §§ 705 & 706; and 16 U.S.C. § 1540(g).  The challenged agency actions are final and subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706.

## VENUE

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A), as this is a civil action brought against officers and employees of the United States acting in their official capacities under the color of legal authority, and against agencies of the United States; Defendants reside and are headquartered within the District of Columbia; no real property is involved in this action; Plaintiff Earthworks resides and is headquartered within

the District of Columbia; and Plaintiff Center for Biological Diversity maintains an office in the District of Columbia.

## PARTIES

6.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit corporation headquartered in Tucson, Arizona, with offices in Washington, DC, a number of states, and La Paz, Mexico.  The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is actively involved in endangered species and habitat protection issues nationwide and in Mexico, and has more than 48,000 members throughout the United States and the world.

7.      Plaintiff EARTHWORKS is a non-profit corporation headquartered in Washington DC.  Earthworks is dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions. Earthworks stands for clean air, water and land, healthy communities, and corporate accountability.  Earthworks works for solutions that protect both the Earth's resources and our communities, and has more than 65,000 members throughout the United States and the world.

8.      Plaintiffs bring this action on their own behalf, and on behalf of their members who derive scientific, aesthetic, recreational, and spiritual benefits from northern long-eared bats, gray wolves, and Canada lynx, and their habitats.

9.      Plaintiffs' members use and enjoy the Superior National Forest for a variety of purposes, including hiking, fishing, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities.  The areas of the Superior National Forest that Plaintiffs' members use and enjoy include specific areas where northern long-eared bats, gray wolves and Canada lynx may be found.  Plaintiffs' members derive health,

recreational, inspirational, religious, scientific, educational, and aesthetic benefits from their

activities within the Superior National Forest.  Plaintiffs' members intend to continue to use and

enjoy the Superior National Forest frequently and on an ongoing basis in the future, including

this summer and fall.  The areas of the Superior National Forest that Plaintiffs' members intend

to continue to use and enjoy include specific areas where the northern long-eared bat, gray wolf,

and Canada lynx may be found.

10.     The health, aesthetic, recreational, scientific, educational, religious, and

procedural interests of Plaintiffs and their members have been and will continue to be adversely

affected and irreparably injured if Defendants' ongoing violations of the ESA and APA continue.

These are actual, concrete injuries caused by the Defendants' violations of the ESA and APA.

Plaintiffs' and their members' injuries will be redressed by the relief sought.

11.     Defendant THOMAS L. TIDWELL, Chief of the U.S. Forest Service, is the

highest-ranking official within the U.S. Forest Service, and in that capacity, has ultimate

responsibility for the lawful management of the National Forest System, including the Superior

National Forest.  Chief Tidwell is sued in his official capacity.

12.     Defendant U.S. FOREST SERVICE ("Forest Service") is an agency within the

U.S. Department of Agriculture.  It and its officers are responsible for the lawful management of

the National Forest System, including the Superior National Forest.

13.     Defendant U.S. DEPARTMENT OF AGRICULTURE is the federal department

that is responsible for developing and executing federal policy on farming, agriculture, forestry,

and food, and which oversees the U.S. Forest Service.

14.     Defendant SALLY JEWELL, U.S. Secretary of the Interior, is the highest-ranking

official within the U.S. Department of the Interior, and in that capacity, has ultimate

responsibility for the administration and implementation of the ESA with regard to terrestrial endangered and threatened species, including the northern long-eared bat, gray wolf and Canada lynx.  Secretary Jewell is sued in her official capacity.

15.     Defendant U.S. FISH AND WILDLIFE SERVICE ("FWS") is an agency within the U.S. Department of the Interior.  It and its officers are responsible for administering the ESA, particularly regarding potential impacts to terrestrial wildlife species that have been listed as threatened or endangered with extinction pursuant to the ESA, including the northern long-eared bat, gray wolf and Canada lynx.

## STATUTORY AND REGULATORY BACKGROUND

A.     **Endangered Species Act**

16.     The ESA requires all federal agencies to utilize their authorities to carry out programs for the conservation of threatened and endangered species.  16 U.S.C. § 1536(a)(1).

17.     The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).  The ESA defines "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).

18.     The ESA requires the Forest Service, in consultation with FWS, to "insure that any action authorized, funded, or carried out by" the Forest Service "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the critical habitat of such species.  16 U.S.C. § 1536(a)(2).  FWS and the Forest Service must use the best scientific data available during the consultation process.  *Id*.

19.     "Action" is broadly defined under the ESA to include all activities or programs of any kind authorized, funded, or carried out by federal agencies, including actions directly or indirectly causing modifications to the land, water, or air; actions intended to conserve listed species or their habitat; and the promulgation of regulations.  50 C.F.R. § 402.02.

20.     For each federal action, the Forest Service must request from FWS whether any listed or proposed species may be present in the area of the agency action.  16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.  If listed or proposed species may be present, the Forest Service must prepare a "biological assessment" to determine whether the listed species is likely to be adversely affected by the proposed action.  *Id.*

21.     If the Forest Service determines that a proposed action may affect any listed species or critical habitat, the agency must engage in formal consultation with FWS, unless the biological assessment concludes that the action is not likely to adversely affect any listed species or critical habitat, and FWS concurs with that finding.  50 C.F.R. § 402.14.

22.     To complete formal consultation, FWS must provide the Forest Service with a "biological opinion," explaining how the proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.

23.     If FWS concludes that the proposed action "will jeopardize the continued existence" of a listed species or result in the destruction or adverse modification of critical habitat, the biological opinion must outline "reasonable and prudent alternatives."  16 U.S.C. § 1536(b)(3)(A).

24.     If the biological opinion concludes that the action is not likely to jeopardize the continued existence of a listed species, and will not result in the destruction or adverse modification of critical habitat, FWS must provide an "incidental take statement," specifying the

amount or extent of incidental taking on such listed species and any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the Forest Service to implement those measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

25.     In order to monitor the impacts of incidental take, the Forest Service must monitor and report the impact of its action on the listed species to FWS as specified in the incidental take statement.  16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(iv), 402.14(i)(3).  If during the course of the action, the amount or extent of incidental taking is exceeded, the Forest Service must reinitiate consultation with FWS immediately.  50 C.F.R. § 401.14(i)(4).

26.     The reinitiation of formal consultation is required and must be requested by the Forest Service or FWS where discretionary federal involvement or control over the action has been retained or is authorized by law, and if (1) the amount or extent of taking specified in the incidental take statement is exceeded; (2) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) the action is modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (4) a new species is listed or critical habitat designated that may be affected by the identified action.  50 C.F.R. § 402.16.

27.     After the initiation or reinitiation of consultation, the Forest Service is prohibited from making any irreversible or irretrievable commitment of resources with respect to the agency action which may foreclose the formulation or implementation of any reasonable and prudent alternative measures.  16 U.S.C. § 1536(d).

28.     Section 9 of the ESA and its implementing regulations prohibit the unauthorized "take" of listed species.  16 U.S.C. § 1538(a)(1); 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31.  "Take"

is defined broadly to include harming, harassing, trapping, capturing, wounding or killing a protected species either directly or by degrading its habitat.  16 U.S.C. § 1532(19); 50 C.F.R. § 17.3 (defining harm to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patters, including breeding, feeding, or sheltering").  Taking that is in compliance with the terms and conditions specified in the incidental take statement of a biological opinion is not considered a prohibited taking under Section 9 of the ESA.  16 U.S.C. § 1536(o)(2).

**B.      Administrative Procedure Act**

29.      Pursuant to the Administrative Procedure Act ("APA"), a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  5 U.S.C. § 702.  Agency action made reviewable by statute and final agency actions for which there is no adequate remedy in court are subject to judicial review.  5 U.S.C. § 704.

30.      The APA directs a court to compel agency action unlawfully withheld or unreasonably delayed; and to hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, or agency action that is undertaken without observance of procedure required by law.  5 U.S.C. § 706.

## FACTUAL ALLEGATIONS

**A.      The Northern Long-Eared Bat**

31.      The northern long-eared bat was listed by FWS as a threatened species under the ESA in April, 2015.  FWS decided in 2015 that the designation of critical habitat for the northern long-eared bat was not determinable at that time.  In April, 2016, FWS issued a final rule finding that designating critical habitat for the northern long-eared bat is "not prudent."

32.     Known for their long ears and secretive roosting and hibernating strategies, the northern long-eared bat is a temperate, insectivorous, migratory bat that hibernates in mines and caves in the winter and spends summers in wooded areas.  The bat generally hibernates from mid-fall through mid-spring each year.  The bats play an essential ecological role in keeping insect populations in check.

33.     Suitable summer habitat for the northern long-eared bat consists of a wide variety of forested habitats where they roost and forage.  Upon their emergence from the hibernacula (locations chosen by a species for hibernation) in the spring, female bats seek suitable habitat for maternity colonies.  Females give birth to a single offspring, typically in mid-May to early June each year.

34.     The main threat to the northern long-eared bat is an invasive and often deadly fungal bat disease commonly referred to as White-Nose Syndrome, which has rampantly spread in bat populations from the Northeast to the Midwest and Southeast of the United States. Population numbers of the northern long-eared bat have declined by 99 percent in the Northeast. Due to White-Nose Syndrome, northern long-eared bats are also increasingly vulnerable to other stressors, such as habitat degradation and fragmentation, that further imperil the entire bat population.

35.     In Minnesota, northern long-eared bat populations are known from 15 hibernacula.  An estimated 3,000 northern long-eared bats are thought to hibernate in the largest known hibernaculum in Minnesota, the Soudan Mine in St. Louis County.

36.     White-Nose Syndrome has not yet been detected in Minnesota; however, the fungus that causes White-Nose Syndrome has been detected.

37.     In November, 2015, FWS completed a biological opinion for activities affecting

the northern long-eared bat within the Eastern Region of the National Forest System, which includes the Superior National Forest.  FWS concluded that these activities are not likely to jeopardize the continued existence of the northern long-eared bat.

38.     On January 14, 2016, FWS published a final "4(d) Rule" for the northern long-eared bat, pursuant to Section 4(d) of the ESA.  16 U.S.C. § 1533(d).  The 4(d) rule only prohibits the "incidental take" of northern long-eared bats within areas impacted by White-Nose Syndrome if the take occurs within known hibernaculum; results from tree removal activities that are within 0.25 mile of a known hibernaculum; or the implicated activities cut or destroy a known, occupied maternity roost tree or others trees within a 150-foot radius from the known, occupied maternity roost tree during the pup season from June 1 through July 31.  The rule also prohibits the purposeful take of the northern long-eared bat, except in limited circumstances.

39.     On May 3, 2016, the plaintiffs in *Center for Biological Diversity, et al. v. Ashe, et al*., Civ. No. 1:15-cv-00477-EGS (D.D.C.), filed an amended complaint to include claims challenging as unlawful FWS's "4(d) Rule" for the northern long-eared bat, and the related biological opinion, pursuant to the ESA, 16 U.S.C. § 1536(a)(2), and APA, 5 U.S.C. § 706(2).

**B.     The Gray Wolf**

40.     Gray wolves are the largest wild members of the dog family, with adults weighing up to 175 pounds.  Gray wolves play a critical ecological role as a top predator and keystone species.  In response to their vastly declining numbers, FWS designated the gray wolf as an endangered species under the ESA in 1974.  The Minnesota population of gray wolves was reclassified as a threatened species in 1978.

41.     In 1978, FWS designated critical habitat for the gray wolf in Minnesota and Michigan.  All of the Superior National Forest is designated as critical habitat for the gray wolf.

42.     In 2011, FWS estimated that the population of wolves in Minnesota was 2,921. FWS has estimated that as of 2008, there were 484 wolves on the Superior National Forest.

43.     A number of land management activities on the Superior National Forest may affect wolves and wolf habitat, including the management of timber, vegetation, wildland or prescribed fire, wildlife habitat, recreation, roads and trails, minerals exploration, and other human developments.  Land exchanges concerning proposed mining sites on the Superior National Forest may also result in a loss of wolf habitat, wolf prey habitat, and connectivity.

44.     Road construction for mineral exploration projects may increase human-wolf conflicts due to increased human access during the time the roads are being used.

45.     Direct wolf mortality on the Superior National Forest may result from shooting, trapping, predator control, and vehicle collisions.  Large-scale risk factors for wolves on the Superior National Forest include disease, fragmentation and degradation of habitat, climate change, and illegal shooting.

46.     "Low standard roads" provide the highest potential for den site disturbance, shooting, trapping, and vehicle collisions with wolves.  According to the 2011 Biological Opinion, the Superior National Forest has 1927 miles of low standard roads, and 158 additional miles of temporary roads.

47.     The U.S. Department of Agriculture Wildlife Services captures and kills an average of 146 wolves per year in Minnesota on grounds of depredation control.

**C.     The Canada Lynx**

48.     The Canada lynx is a medium-sized cat with long legs and unusually large paws which make it highly adapted for hunting in deep snow.  A mid-size carnivore, the Canada lynx plays an important ecological role in targeting smaller prey species that reproduce relatively

quickly.  In 2000, FWS designed the Canada lynx as a threatened species under the ESA.

49.     The majority of recorded lynx occurrences in Minnesota are from the northeastern portion of the state, where the Superior National Forest is located.

50.     FWS has designated critical habitat for the Canada lynx, including portions of Cook, Koochiching, Lake and St. Louis Counties in Minnesota.  The majority of the Superior National Forest is within designated lynx critical habitat.

51.     A number of land management activities on the Superior National Forest may affect Canada lynx and lynx habitat, including the management of timber, wildland or prescribed fire, recreation, roads and trails, mining exploration and other mining activities, and other human developments.  Land exchanges concerning proposed mining sites on the Superior National Forest may also result in a loss of lynx habitat, lynx prey habitat, and connectivity.

52.     Minerals management and mine development have the potential to adversely affect lynx and lynx critical habitat by reducing habitat quality for denning, foraging, and dispersal; disrupting travel, resting and foraging patters; and disturbing denning females and reducing habitat quality for lynx prey species.

53.     Direct lynx mortality on the Superior National Forest may result from trapping, shooting, predator control, and vehicle collisions.  Other large-scale risk factors to lynx and lynx critical habitat include the fragmentation and degradation of lynx habitat.

54.     Common causes of mortality for lynx include starvation of kittens and trapping. In addition, lynx in Minnesota have been killed by vehicle and train collisions.

55.     Lynx may be accidentally trapped during trapping seasons for other furbearers such as bobcat, fisher, and pine marten.  Lynx may also be mistakenly or intentionally shot by hunters or poachers.

56.     There were 39 lynx mortalities reported in Minnesota between 2000 and 2011, including ten that died after being trapped, seven that died after collisions with cars, seven that were shot, and two that died after collisions with trains.

57.     Between 2000 and 2011, there were at least 17 documented incidents of trapped lynx in Minnesota, and at least seven of these lynx are known to have died.  Moreover, six lynx were shot and killed during this time, with at least two lynx shot and killed on the Superior National Forest.

**D.     The Forest Service's 2004 Forest Plan for the Superior National Forest, and FWS's 2011 Biological Opinion for the Forest Plan**

58.     In 2004, the Forest Service completed a revised "Land and Resource Management Plan" ("Forest Plan") for the Superior National Forest, pursuant to the National Forest Management Act.  16 U.S.C. § 1604(a).  The National Forest Management Act requires that all proposed projects and activities on the Superior National Forest must be consistent with the Forest Plan.  16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.

59.     In 2004, FWS issued a biological opinion concerning the implementation of the Forest Plan for the Superior National Forest and the impacts on the gray wolf and Canada lynx.

60.     In 2009, FWS finalized a revised critical habitat designation for the Canada lynx. The revised critical habitat designation triggered the need for FWS and the Forest Service to reinitiate ESA consultation to assess the effects of implementation of the Superior Forest Plan on lynx critical habitat.

61.     On May 17, 2011, the Forest Service completed a new Biological Assessment for the Forest Plan for the Superior National Forest ("2011 Biological Assessment").  According to the 2011 Biological Assessment, the majority of the Superior National Forest is within the designated lynx critical habitat area, and all of the Superior National Forest is critical habitat for

the gray wolf.

62.     In the 2011 Biological Assessment, the Forest Service determined that implementation of the Forest Plan for the Superior National Forest "may affect, and is likely to adversely affect," the gray wolf, and "may affect, but is not likely to adversely affect" designated critical habitat for the gray wolf.

63.     According to the 2011 Biological Assessment, the Forest Service's determination of "may affect and likely to adversely affect" the gray wolf was based on the potential adverse impacts from human access and disturbances such as illegal shooting, incidental trapping, and possibly unpredictable vehicle collisions in the Superior National Forest.

64.     In the 2011 Biological Assessment, the Forest Service determined that implementation of the Forest Plan for the Superior National Forest "may affect, and is likely to adversely affect," the Canada lynx, and "may affect, but is not likely to adversely affect" designated critical habitat for the Canada lynx.

65.     According to the 2011 Biological Assessment, the Forest Service's determination of "may affect and likely to adversely affect" the Canada lynx was based on the potential adverse impacts from human access and disturbances, primarily from illegal shooting and incidental trapping, and possibly unpredictable vehicle collisions in the Superior National Forest.

66.     On September 16, 2011, FWS completed a new Biological Opinion for the Forest Plan for the Superior National Forest ("2011 Biological Opinion").  According to the 2011 Biological Opinion, FWS assessed all Forest Plan activities that are (1) directed or allowed and (2) proposed or probable.  These activities include timber harvest, wildlife habitat management, road and trail construction and maintenance, construction and maintenance of recreational facilities, hazardous fuels reduction, and habitat improvement.

67.     In the 2011 Biological Opinion, FWS concluded that continued implementation of the Superior Forest Plan is not likely to jeopardize the continued existence of either the gray wolf or Canada lynx.

68.     In the 2011 Biological Opinion, FWS concurred with the Forest Service that continued implementation of the Superior Forest Plan is not likely to adversely affect critical habitat for either the gray wolf or Canada lynx.

69.     FWS's determination in the 2011 Biological Opinion that implementation of the Forest Plan is not likely to adversely affect critical habitat for the gray wolf or Canada lynx did not consider and is contradicted by the predicted impacts of the proposed NorthMet mine and land exchange on the Superior National Forest, as recognized by the Forest Service and FWS in agency analyses and documents.

70.     Two weeks prior to the issuance of the 2011 Biological Opinion, FWS issued a separate biological opinion for the proposed expansion of the Northshore mine project, an open-pit iron ore mine and the related proposed relocation of a highway ("Northshore Mine"), that is located within critical habitat for the gray wolf  near the Superior National Forest.  The proposed expansion of the Northshore Mine would increase the mine and stockpile footprints by a total of 47 acres, which FWS determined was likely to adversely affect gray wolf critical habitat.

71.     FWS determined in the 2011 Biological Opinion that continued implementation of the Forest Plan would result in "takings" of gray wolves and Canada lynx.  As a result, the 2011 Biological Opinion includes an "Incidental Take Statement" for both the gray wolf and Canada lynx.

72.     With respect to gray wolves, FWS determined in the 2011 Biological Opinion that take of gray wolves on the Superior National Forest could occur in the form of harassment

during project implementation, and death related to human disturbance and vehicle collisions.

73.     FWS failed to determine or estimate in the 2011 Biological Opinion the amount or extent of incidental take that it anticipated would occur in the form of harassment to wolves during project implementation, and failed to include any reasonable and prudent measures, or terms and conditions, for the incidental take of wolves caused by harassment.

74.     FWS determined in the 2011 Biological Opinion that mortality to gray wolves on the Superior National Forest could occur through vehicle collisions and "illegal hunting or shooting."

75.     FWS concluded in the 2011 Biological Opinion that "the Forest Service has no jurisdiction or authority over illegal hunting of wolves," and that "[a]ny take that occurs due to illegal hunting or shooting is outside the jurisdiction and authority of the Forest Service and not exempted by this Incidental Take Statement."

76.     Within the Incidental Take Statement for wolves in the 2011 Biological Opinion, FWS determined that no more than five wolves would be taken annually on the Superior National Forest and no more than 50 wolves would be taken over the 10-years of remaining life of the Forest Plan due to vehicle collision on all roads of all ownerships within the Superior National Forest proclamation boundary.

77.     As part of the Incidental Take Statement for gray wolves, FWS provided a single "reasonable and prudent measure" to "minimize" the effects of incidental takes on the gray wolf: "Document and report to the Service annually any known wolf mortality within the National Forest proclamation boundaries in Minnesota due to vehicle collisions or poaching."

78.     As part of the Incidental Take Statement for gray wolves, FWS provided two "terms and conditions" to implement the reasonable and prudent measure for wolves.  First,

"mortality reports" "should" be provided to FWS by December 31 of each year.  Second, the

Forest Service is required to coordinate with the state, county, Tribes and others "to collect

information necessary for this reporting system."  According to the Incidental Take Statement,

"[i]nformation voluntarily provided by these agencies, researchers, and others would fulfill the

requirements of the reasonable and prudent measure."

79.     According to the Forest Service, the 2011 Biological Opinion "does not contain a

requirement to annually report wolf morality to the U.S. Fish and Wildlife Service (USFWS).

Therefore no such reports exist."

80.     The Forest Service does not track wolf mortality resulting from trapping or

hunting on the Superior National Forest.  FWS does not track road-killed wolves on the Superior

National Forest.

81.     With respect to the Canada lynx, FWS determined in the 2011 Biological Opinion

that take in the form of harm from habitat disturbance may occur, as could harassment and/or

death related to human disturbance and incidental trapping.

82.     FWS failed to determine or estimate in the 2011 Biological Opinion the amount

or extent of incidental take that it anticipates will occur in the form of harm or harassment to

lynx during project implementation, and failed to include any reasonable and prudent measures,

or terms and conditions, for the incidental take of lynx caused by harm or harassment.

83.     FWS acknowledged in the 2011 Biological Opinion that adverse effects to

Canada lynx from incidental trapping remain likely under the Forest Plan, and that these effects

result indirectly from implementation of the Forest Plan.  FWS stated, however, that "[t]he

Superior National Forest does not have authority over furbearer trapping, nor do they have the

discretion to allow or disallow its use on the Forest."  As further stated by FWS, "[a]ny take that

occurs due to accidental trapping of lynx in furbearer sets is outside the jurisdiction and authority

of the Forest Service and not exempted by this Incidental Take Statement."

84.     FWS concluded that "no more than one lynx would be taken annually on the

Superior National Forest and no more than 10 would be taken over the 10-year life of the Forest

Plan due to vehicle collision on all roads on all ownerships within the Superior National Forest

proclamation boundary."

85.     As with the gray wolf, FWS provided a single "reasonable and prudent measure"

in the Incidental Take Statement of the 2011 Biological Opinion to "minimize" the effects of

incidental takes on the Canada lynx:  "Document and report to the Service annually any known

lynx mortality within the National Forest proclamation boundaries in Minnesota due to vehicle

collisions, accidental trapping, or poaching."

86.     FWS also similarly provided two "terms and conditions" in the Incidental Take

Statement to implement the reasonable and prudent measure.  First, "mortality reports" "should"

be provided to FWS by December 31 of each year.  Second, the Forest Service is again to

coordinate with the state, county, Tribes and others "to collect information necessary for this

reporting system." As with wolves, "[i]nformation voluntarily provided by these agencies,

researchers, and others . . . would fulfill the requirements of the reasonable and prudent

measure."

87.     Two weeks prior to issuing the 2011 Biological Opinion, FWS found in the

September 2, 2011 biological opinion for the Northshore Mine that the proposed Northshore

mine expansion would also result in the incidental take of gray wolf and Canada lynx as result of

vehicle collisions.  In that biological opinion, FWS imposed reasonable and prudent measures

that would minimize the impacts of the anticipated incidental take, as opposed to only

monitoring and reporting requirements. These reasonable and prudent measures included a speed limit reduction, and the removal of road-killed deer or moose along the highway.

**E.     New Information and Listings Triggering the Reinitiation Requirement**

88.     The 2011 Biological Opinion included a "Reinitiation – Closing Statement," stating that, as required by 50 C.F.R. § 402.16, the reinitiation of formal consultation is required if (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in the biological opinion; (3) the agency action is modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action.

89.     There has been significant new information, changed circumstances, and a new species listed since completion of the 2011 Biological Opinion.

90.     On April 2, 2015, FWS published a final rule listing the northern long-eared bat as a threatened species under the ESA, which took effect on May 4, 2015. 80 Fed. Reg. 17,974 (April 2, 2015). The northern long-eared bat is found on the Superior National Forest, and this newly listed species will be adversely affected by projects and activities authorized by the Forest Service on the Superior National Forest.

91.     New information reveals effects of the action that may affect listed species and critical habitat in a manner or to an extent not considered in the 2011 Biological Opinion. For instance, the Forest Service and FWS have determined that the proposed NorthMet project will likely adversely affect the northern long-eared bat, gray wolf, Canada lynx, and critical habitat for gray wolves and Canada lynx; and almost all county roads in Lake County and St. Louis County were recently opened to "all-terrain vehicles" (ATVs).

92.     Neither FWS nor the Forest Service can determine whether the amount or extent of taking specified in the incidental take statement for the gray wolf or Canada lynx has been exceeded, as neither agency has conducted consistent and comprehensive monitoring or reporting on the takings for either species on the Superior National Forest since 2011.

**F.     Defendants' Response to Plaintiffs' Notice of Intent to Sue**

93.     On December 21, 2015, the Plaintiff Center for Biological Diversity provided the Forest Service and FWS with a sixty-day notice letter, notifying the agencies of the Center's intention to file suit under the ESA citizen suit provision concerning the agencies' failure to comply with the ESA for listed species and critical habitat on the Superior National Forest.

94.     On February 29, 2016, the Forest Service responded to the Center's December 21, 2015 notice letter.  The letter states that Forest Service Chief Tidwell directed Forest Supervisor Brenda Halter to respond to the Center's notice letter.

95.     In the February 29 2016 response, the Forest Service indicates that it will not reinitiate consultation on the continued implementation of the Forest Plan for the Superior National Forest concerning impacts to the newly listed northern long-eared bat due to the "programmatic region-wide consultation on the effect of existing Forest Plans throughout the region on the Northern Long-eared bat," and the resulting November 2015 biological opinion.

96.     In the February 29, 2016 response, the Forest Service states that take from hunting or trapping is outside the jurisdiction and authority of the Forest Service.  The Forest Service further states that the Superior National Forest does not have authority over furbearing trapping and hunting, and does not have the discretion to allow or disallow trapping or hunting on the Superior National Forest.

97.     According to the February 29, 2016 response, the Forest Service and its partners

have documented 11 wolves and 2 lynx that have been killed by vehicles along a road within the Superior National Forest since 2011.

98.     According to the February 26, 2016 response, the federal lands included in the proposed NorthMet land exchange do not fall within designated lynx critical habitat.

99.     On March 18, 2016, FWS responded to the Center's December 21, 2015 notice letter.  FWS's response acknowledges receipt of the Center's notice letter.

**G.     The Forest Service's Authority to Regulate Hunting and Trapping on the Superior National Forest**

100.     The Forest Service has the authority, discretion, and jurisdiction to ban and otherwise regulate hunting and trapping on the Superior National Forest for at least the following purposes: public safety, the administration of the national forest, ensuring compliance with other laws including the ESA, meeting the agency's land and resource management responsibilities, and meeting the direction and objectives of the Superior Forest Plan.

101.     The Forest Service banned the hunting of gray wolves on the Superior National Forest in 1970, which was in effect until the species was designated as threatened under the ESA.

102.     Pursuant to the Federal Land Policy and Management Act, the Forest Service "may designate areas of public land and of lands in the National Forest System where, and establish periods when, no hunting or fishing will be permitted for reasons of public safety, administration, or compliance with provisions of applicable law." 43 U.S.C. § 1732(b); *see Meister v. U.S. Department of Agriculture*, 623 F.3d 363, 378 (6th Cir. 2010).

103.     Pursuant to the Forest Service's Manual, hunting, fishing, and trapping of fish and wildlife and associated practices on National Forest System lands are subject to State fish and wildlife laws and regulations, unless one or both of the following apply:

a)  State fish and wildlife laws and regulations conflict with
    Federal laws; or

b)  State laws and regulations would permit activities that conflict
    with land and resource management responsibilities of the
    Forest Service or that are inconsistent with direction in forest
    plans.

Forest Service Manual § 2643.1.

104.    Apart from the direct regulation of hunting and trapping, there are a number of

steps or measures the Forest Service could take to decrease the amount and extent of incidental

taking of wolves and lynx on the Superior National Forest from shooting, trapping, and illegal

killing, including but not limited to effective road closures and environmental education efforts.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

FWS's 2011 Biological Opinion Violates the ESA and APA

105.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

106.    FWS's 2011 Biological Opinion for the revised Forest Plan for the Superior

National Forest is unlawful under the ESA and arbitrary and capricious under the APA, for at

least the following reasons:

a)  FWS arbitrarily and unlawfully determined that continued implementation
    of the revised Forest Plan is not likely to adversely affect critical habitat for
    the gray wolf.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

b)  FWS arbitrarily and unlawfully determined that continued implementation
    of the revised Forest Plan is not likely to adversely affect critical habitat for
    the Canada lynx. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

c)   FWS arbitrarily and unlawfully determined that it did not need to include takings caused by hunting, trapping, or shooting in the Incidental Take Statement for the gray wolf or Canada lynx. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

d)   FWS arbitrarily and unlawfully excluded from the Incidental Take Statement the anticipated take of wolves and lynx in the form of harassment and harm. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

e)   FWS failed to include in the Incidental Take Statement any reasonable and prudent measures that will minimize the effects of the anticipated take of gray wolves or Canada lynx. 16 U.S.C. § 1536(b)(4)(ii); 50 C.F.R. § 402.14(i)(1)(ii).

f)   FWS failed to include in the Incidental Take Statement sufficient monitoring and reporting requirements to allow FWS or the Forest Service to determine whether or not the amount of incidental take for gray wolves or Canada lynx has been exceeded. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

g)   FWS failed to use the best scientific and commercial data available.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

107.   FWS violated the ESA in preparing and approving the 2011 Biological Opinion. 16 U.S.C. § 1536; 50 C.F.R. § 402.14.  The 2011 Biological Opinion is arbitrary, capricious, and not in accordance with the ESA.  5 U.S.C. § 706(2)(A).  The 2011 Biological Opinion should be set aside and remanded to FWS.  *Id.*

108.   Because the 2011 Biological Opinion is unlawful, the Forest Service is in ongoing violation of its substantive duty under Section 7 of the ESA to insure that implementation of the

Forest Plan for the Superior National Forest is not likely to jeopardize the continued existence of any listed species on the Superior National Forest or result in the destruction or adverse modification of the listed species' designated critical habitat.  16 U.S.C. § 1536(a)(2).

## SECOND CLAIM FOR RELIEF

<u>FWS and the Forest Service have Violated the ESA by Failing to Timely Reinitiate and Complete Consultation on the Revised Forest Plan for the Superior National Forest</u>

109.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

110.    The reinitiation of consultation under Section 7 of the ESA is required where discretionary federal involvement or control over the action has been retained or is authorized by law, and if (1) the amount or extent of taking specified in an incidental take statement is exceeded; (2) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) the action is modified in a manner that causes an effect to listed species or critical habitat that was not considered in the biological opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action.  50 C.F.R. § 402.16.

111.    The Forest Service retains discretionary involvement and control over the continued implementation of the Superior Forest Plan.

112.    Since completion of the 2011 Biological Opinion, the northern long-eared bat has been designated by FWS as a threatened species.  The northern long-eared bat is found on the Superior National Forest, and may be adversely affected by the continued implementation of the Superior Forest Plan.

113.    Since completion of the 2011 Biological Opinion, there has been new information that reveals impacts of the continued implementation of Superior Forest Plan that may affect listed species or critical habitat in a manner or to an extent not considered in the 2011 Biological

Opinion.

114.    FWS and the Forest Service lack the required monitoring and reporting program

necessary to determine whether or not the amount or extent of incidental taking anticipated in the

2011 Biological Opinion has been exceeded.

115.    FWS and the Forest Service have failed to timely reinitiate and complete the

reinitiated consultation regarding the continued implementation and impacts of the Superior

Forest Plan on listed species and their critical habitat, in violation of the ESA.  16 U.S.C. §

1536(a)(2); 50 C.F.R. §§ 402.14(i)(4), 402.16.

### THIRD CLAIM FOR RELIEF

<u>The Forest Service's Continued Authorization of Projects and Activities that May Affect
Listed Species or Critical Habitat on the Superior National Forest is Unlawful</u>

116.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

117.    The Forest Service continues to approve, authorize, and implement projects and

activities on the Superior National Forest that may affect the northern long-eared bat, gray wolf,

Canada lynx, or their critical habitat.

118.    By allowing, authorizing, and approving projects and activities to proceed on the

Superior National Forest that may affect the northern long-eared bat, gray wolf, Canada lynx, or

their critical habitat, prior to the reinitiation of consultation with FWS on the Superior Forest

Plan, the Forest Service is violating the ESA.  16 U.S.C. § 1536(a)(2); *see Pacific Rivers Council

v. Thomas*, 30 F.3d 1050, 1056 (9th Cir. 1994) (holding that Section 7(d) of the ESA "does not

serve as a basis for any governmental action unless and until consultation has been initiated").

119.    Additionally, by allowing, authorizing, and approving projects and activities to

proceed on the Superior National Forest that may affect the northern long-eared bat, gray wolf,

Canada lynx, or their critical habitat, prior to the completion of reinitiated consultation with FWS

on the Superior Forest Plan, the Forest Service is violating Section 7(d) of the ESA.  16 U.S.C. §

1536(d).

## RELIEF REQUESTED

WHEREFORE, the Center respectfully requests that this Court:

A.      Declare that the 2011 Biological Opinion is unlawful under the ESA and arbitrary

and capricious under the APA;

B.      Declare that the Forest Service's reliance on the unlawful 2011 Biological

Opinion violates the ESA;

C.      Declare that FWS and the Forest Service are in ongoing violation of the ESA

regarding their failure to timely reinitiate and complete consultation on the Forest Plan for the

Superior National Forest;

D.      Compel FWS and the Forest Service to immediately reinitiate and timely

complete consultation on the Forest Plan for the Superior National Forest;

E.      Declare that the Forest Service is in violation of the ESA for approving,

authorizing, and implementing activities and projects that may affect the northern long-eared bat,

gray wolf, Canada lynx, or their critical habitat pending the reinitiation and completion of the

reinitiated consultation, and preparation of a legally valid Biological Opinion, concerning the

continued implementation of the Forest Plan for the Superior National Forest;

F.      Order injunctive relief as necessary to protect the northern long-eared bat, gray

wolf, Canada lynx, and their critical habitat, pending the completion of the required reinitiation of

consultation and preparation of a legally valid Biological Opinion;

G.      Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable

attorney fees pursuant to applicable law including the Endangered Species Act, 16 U.S.C. §

1540(g); and Equal Access to Justice Act, 28 U.S.C. § 2412; and

      H.     Grant the Plaintiffs such further relief as may be just, proper, and equitable.

Dated: June 6, 2016.             Respectfully submitted,

                    WILLIAM J. SNAPE (DC Bar No. 455266)
                    Center for Biological Diversity
                    1411 K St. NW, Suite 1300
                    Washington, DC 20005
                    Telephone: (202) 536-9351
                    Email: bsnape@biologicaldiversity.org

                    MARC D. FINK (MN Bar No. 0343407, *pro hac vice pending*)
                    Center for Biological Diversity
                    209 East 7th St.
                    Duluth, Minnesota  55805
                    Telephone: (218) 464-0539
                    Email: mfink@biologicaldiversity.org

                    */s/ Anchun Jean Su*
                    ANCHUN JEAN SU (CA285167)
                    Center for Biological Diversity
                    1212 Broadway Street, Suite 800
                    Oakland, CA 94612
                    Telephone: (510) 844-7139
                    Email: jsu@biologicaldiversity.org

                    *Attorneys for Plaintiffs*